## Hiba Charara vs. Said Yatim.

No. 09-P-1189.

Worcester. April 8, 2010. - November 23, 2010.

Present: Duffly, Dreben, & Kafker, JJ.

*Child Custody Jurisdiction Act. Jurisdiction,* Custody of child, Probate Court. *Probate Court,* Custody of child, Jurisdiction. *Divorce and Separation,* Jurisdiction, Foreign determination as to custody of child, Child support. *Parent and Child,* Child support.

A judge of the Probate and Family Court properly exercised jurisdiction over a custody dispute that was the subject of a custody order issued in the father's favor by a religious tribunal in Lebanon, where the children had been living in Lebanon for less that six months when the father filed the guardianship action there, the mother currently resided in Massachusetts, and thus no other State had jurisdiction over the matter under the Massachusetts Child Custody Jurisdiction Act, G. L. c. 209B [329-331]; further, in awarding custody of the children to the mother, the judge correctly concluded that no deference was due the custody order issued by the Lebanese tribunal, where the evidence demonstrated that that custody judgment was not made in substantial conformity with Massachusetts law regarding the best interests of the children [331-336]; and where the mother's agreement to the Lebanese custody order was obtained under duress and was thus unenforceable [336-338].
This court modified a child support order that contained a scrivener's error. [338-339]

Complaint for divorce filed in the Worcester Division of the Probate and Family Court Department on April 5, 2007.

The case was heard by *Gregory V. Roach,* J.

*Thomas K. Birch* for the defendant.

*Paul C. Foley* for the plaintiff.

Duffly, J. This is an appeal by the father, Said Yatim, from a divorce judgment entered in the Probate and Family Court that awarded custody of the couple's two minor children to the mother, Hiba Charara; divided their property; and ordered the father to pay child support. The parties, as well as their children,

are United States citizens who were living in Massachusetts when the marriage suffered an irretrievable breakdown in 2004. On May 30, 2004, the couple (with their children) returned to Lebanon for the purposes of there obtaining a religious divorce. Once in Lebanon, the father did not institute divorce proceedings as he had agreed, but instead sought and obtained custody of the two children. The mother returned to the Commonwealth and instituted the underlying divorce action, in which she also sought custody and child support. Following a trial, a judge of the Probate and Family Court concluded that no deference was due the custody order issued by a Jaafarite religious tribunal (Jaafarite Court) in Lebanon. The probate judge based his decision on evidence, including the testimony of experts, that the Jaafarite Court's custody order was not made in "substantial conformity" with Massachusetts law regarding the best interests of the children. With a modification to the judgment, discussed *infra*, we affirm the award of custody to the mother and child support in the amount of $184 per week.

I. *Background.* A. *Facts.* "We draw our factual summary from the findings of the judge, . . . and the uncontested facts of record, all of which are supported by the trial record. We reserve some details for later discussion where pertinent to our analysis." *Millennium Equity Holdings, LLC* v. *Mahlowitz*, 456 Mass. 627, 630 (2010) (footnote omitted).

The mother and the father, who were born in Lebanon, are Shia Muslims. The father emigrated from Lebanon to the United States where he then entered college in Massachusetts, earning an undergraduate degree in electrical engineering in 1990, and thereafter a graduate degree in software engineering. The father became a United States citizen in 1992. The parties were married on June 29, 1995, in an Islamic religious ceremony performed in Lebanon.[1] At the time, the father was employed in Boston as a software engineer, and he returned to Massachusetts soon after the wedding. The mother joined him in May, 1996, becoming a naturalized citizen of the United States in 2001. Two sons were born of the marriage, the first in November of 1998 and

---

[1]This was the mother's first marriage. The father testified that he previously was married, and that he was divorced in Dedham in about 1993.

the second in September of 2002. Both sons were born in the Commonwealth and therefore are United States citizens.

During the years the parties resided in Massachusetts, the mother was primarily responsible for the home and, after the birth of the children, was their primary caretaker. As the father worked increasingly less (and eventually not at all) due to health issues, the mother also was employed outside the home, first as a salesperson and later as a financial administrator. In 2002, the father began receiving private long term disability payments; in 2004, he began receiving Social Security Disability Insurance benefits after the Social Security Administration determined him to be disabled from employment.[2] In 2003, the father traveled to Lebanon for medical treatments, and the mother alone cared for the two children until his return three months later, in 2004.

The parties began to experience marital difficulties, and after the father's return to Massachusetts, they discussed divorce. The judge found that the marriage suffered an irretrievable breakdown in the Commonwealth in 2004. He further found that the parties "agreed to return to Lebanon for the purposes of obtaining a religious divorce," and that "the [mother] would receive custody of the children."[3] The parties sold the marital residence and equally divided the sale proceeds. On May 30, 2004, the parties traveled with their young sons to Beirut, Lebanon, where the mother and the children stayed at the home of her parents and the father stayed at the home of his parents.

Once in Lebanon, the father did not agree to a divorce or to giving the mother custody of the children.

B. *Proceedings.* On June 23, 2004, the father initiated an action for reconciliation and custody in the Jaafarite Court in Lebanon.[4] That court has jurisdiction over family matters aris-

---

[2] The parties' testimony reflects agreement that the father's disability did not disable him from caring for the children.

[3] The mother testified that she made the decision to seek a divorce in Massachusetts and to remain here with the children, but later, as a result of a conversation with the father, she understood she would have to obtain a religious divorce in the court of the father's religious sect in Lebanon if she ever wished to remarry.

[4] In his petition, the father alleged that the mother was not obeying him, refused to cohabit with him, and was no longer under his submission. A judgment in favor of the father was thereafter entered on the petition that "oblige[d]

ing between persons of the Shia sect of the Islamic religion.[5] At about the same time, he sought the imposition of a travel ban against the mother. On July 5, 2004, the father brought a guardianship action seeking custody of the two children. By a temporary order dated July 29, 2004, the father was given custody of the children and a travel ban issued that prohibited the mother and the children from traveling outside Lebanon. Additional proceedings not relevant here also were instituted.

The mother was advised by her attorneys that, absent the father's agreement, she would have no chance of obtaining custody of the two sons in the Jaafarite Court in Lebanon after they reached the age of two years. The probate judge found that she entered into an agreement that the father have custody of the minor children and that she have visitation two days per week "only because she knew that under the substantive law of [the Jaafarite Court], she could not obtain custody and was merely attempting to secure visitation."

On November 14, 2005, the Jaafarite Court entered a permanent decree in the guardianship action, which confirmed the parties' agreement that the father would have guardianship (legal and physical custody) of the children, then seven and three years old. No divorce proceeding was initiated in the Jaafarite Court.[6]

The travel ban imposed on the mother was lifted sometime in late 2005; she eventually left Lebanon without the children, returning to Massachusetts in March of 2006. On April 5, 2007, she filed the underlying complaint for divorce in which she also

the [mother] to obey . . . and cohabit[]" with the father, "otherwise she will be considered as disobedient."

[5]As reflected in the testimony of experts and other documents of record, there are different Islamic religious tribunals in Lebanon for each of the main religions. The Shia are governed by the Jaafarite school. By an enactment issued in 1962, "[t]he Sunni and Jaafari Doctrine Judiciary courts are considered as a part of the state's Judicial organization."

[6]The mother testified that she was unable to divorce the father in Lebanon absent his agreement, and that he refused to agree to a divorce once they arrived there. The judge noted that the mother's expert testified that "for a woman to obtain a divorce in the court which had jurisdiction over the parties in this case, she would have to prove that the husband committed a crime, abused her, or abandoned her but that a man can obtain a divorce whenever he wants." The mother's expert further testified that the mother only could obtain a divorce in a Jaafarite Court if the father agreed.

sought custody of the children.[7] An attorney appeared on behalf of the father and filed an answer to the complaint.

Following a two-day trial, a judgment of divorce nisi issued on October 1, 2008, which became absolute on December 31, 2008. The judgment granted a divorce for the cause of irretrievable breakdown of the marriage; awarded legal and physical custody of the children to the mother, with reasonable visitation to the father; divided their property; and ordered the father to pay $184 dollars in weekly child support.[8]

On appeal, the father does not specifically challenge the probate judge's findings that it was in the best interests of the minor children that the mother be awarded legal and physical custody of them. Rather, he claims that the Jaafarite Court decree awarding him custody is entitled to deference. As to the child support order, the father asserts that the probate judge erred in calculating the award.

II. *Discussion.* In deciding the question whether the Jaafarite Court's decree should be given deference, the probate judge engaged in a two-step determination. He first determined that the Probate and Family Court "has jurisdiction to make a custody determination in this case pursuant to G. L. c. 209B, § 2(*a*)(2), because no other state is the home state of the [children], the [mother] resides here, and because the children and the parties resided here until 2004, there exists substantial evidence here regarding the children and their care." Second, he "decline[d] to give deference to the Lebanese Judgment because it was not in 'substantial conformity' with the laws of Massachusetts. G. L.

---

[7]An earlier complaint for divorce was dismissed for lack of subject matter jurisdiction. In the instant action, the judge found that the marriage suffered an irretrievable breakdown within the Commonwealth during 2004. Thus, the jurisdictional requirements of G. L. c. 208, § 5, would be met "if the plaintiff is domiciled within the commonwealth at the time of the commencement of the action." G. L. c. 208, § 5, as appearing in St. 1975, c. 400, § 10. See *Caffyn* v. *Caffyn*, 441 Mass. 487, 491-493 (2004). The probate judge made no findings regarding whether the mother ever changed her domicile from Massachusetts to Lebanon. It is uncontested, and the evidence supports a conclusion, that the mother was domiciled in the Commonwealth at least as of the date of commencement of the underlying divorce action.

[8]The father does not appeal from the judgment insofar as it divides the marital estate between the parties in a manner the judge determined to be "relatively equal."

c. 209B, § 14." The father's various challenges to these conclusions are discussed *infra.*

A. *Jurisdiction under MCCJA.* The father claims that the probate judge erred in concluding that, because "no other state is the home state" of the children, the judge properly could exercise jurisdiction pursuant to G. L. c. 209B, also known as the Massachusetts Child Custody Jurisdiction Act (MCCJA).[9]

Under *Khan* v. *Saminni*, 446 Mass. 88, 91 (2006), whether to extend deference to the judgment of another nation begins with our consideration of whether § 2 of the MCCJA bars or permits the exercise of jurisdiction. "The Probate Court judge's decision to exercise jurisdiction under the MCCJA is a discretionary one." *Orchard* v. *Orchard*, 43 Mass. App. Ct. 775, 779 (1997), citing *Tazziz* v. *Tazziz*, 26 Mass. App. Ct. 809, 815 (1988). See *Adoption of Yvette (No. 1)*, 71 Mass. App. Ct. 327, 335 (2008), citing *E.N.* v. *E.S.*, 67 Mass. App. Ct. 182, 191-192 & n.20 (2006).

That portion of the MCCJA on which the probate judge relied in exercising jurisdiction is G. L. c. 209B, § 2(*a*)(2), inserted by St. 1983, c. 680, § 1, which permits the exercise of jurisdiction if "it appears that no other state would have jurisdiction under paragraph (1)."[10] Lebanon does not have jurisdiction unless

[9] Section 2 of G. L. c. 209B, inserted by St. 1983, c. 680, § 1, provides, in relevant part:

"(*a*) Any court which is competent to decide child custody matters has jurisdiction to make a custody determination by initial or modification judgment if:

"(1) the commonwealth (i) is the home state of the child on the commencement of the custody proceeding, or (ii) had been the child's home state within six months before the date of the commencement of the proceeding and the child is absent from the commonwealth because of his or her removal or retention by a person claiming his or her custody or for other reasons, and a parent or person acting as parent continues to reside in the commonwealth; or

"(2) it appears that no other state would have jurisdiction under paragraph (1) and it is in the best interest of the child that a court of the commonwealth assume jurisdiction because (i) the child and his or her parents, or the child and at least one contestant, have a significant connection with the commonwealth, and (ii) there is available in the commonwealth substantial evidence concerning the child's present or future care, protection, training, and personal relationships."

[10] The father does not challenge the judge's findings that support the additional requirements under G. L. c. 209B, § 2(*a*)(2). See note 9, *supra.*

it "is the home state of the child on the commencement of the custody proceeding," G. L. c. 209B, § 2(*a*)(1), that is, unless the children had resided with a parent in Lebanon for at least six consecutive months "immediately preceding the date of commencement of the custody proceeding" in Lebanon. G. L. c. 209B, § 1, inserted by St. 1983, c. 680, § 1.

Here, the parties and their two children traveled from Massachusetts to Lebanon on May 30, 2004; slightly more than one month later, on July 5, 2004, the father filed the guardianship action that produced a temporary custody order and ultimately a decree awarding him legal and physical custody of the children. Lebanon was thus not the home State of the children at the commencement of the father's custody proceeding. The probate judge permissibly could exercise jurisdiction because the children had been living with a parent in Lebanon for less than six months when the father filed the guardianship action in the Jaafarite Court in Lebanon, and thus "no other state" had jurisdiction.[11] G. L. c. 209B, § 2(*a*)(2).

B. *Substantial conformity.* To support his argument that the probate judge erred in concluding that the Jaafarite Court decree was not decided under law in substantial conformity with Massachusetts law governing child custody cases, the father claims (1) that the testimony of his expert supports the conclusion that "the relevant standard for custody matters under the Jaafarite School of Islamic Law in Lebanon is the best interests of the children"; and (2) the mother was under no duress when she entered into the agreement in Lebanon that gave custody to the father.

1. *Best interests standard.* The probate judge's findings and conclusions regarding the substantive law of best interests applied in the Lebanese Jaafarite Court, as compared to that applied in the Commonwealth, are set forth below:

> "Based on the evidence, it is clear that male children in Lebanon go to the Father at the age of two. The parents are not evaluated equally when determining the best interest of the children and which parent should have physical

---

[11]We do not address additional claims by the father that are not supported by citation to relevant authority. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

custody. Although the Mother can obtain custody, it is only if the father is a criminal or cannot or will not care for the children. Unlike Massachusetts which requires that the court determine the best interest of the child and which parent should have custody based upon the 'happiness and welfare of the children,' it is clear that the Lebanese law does not take that into consideration unless the father is unfit. G. L. c. 208, § 31." (Footnote omitted.)

We have said that the " 'substantial conformity' test requires the satisfaction of three procedural components: whether the foreign court (1) had jurisdiction over the parties and the subject matter; (2) applied procedural and substantive law reasonably comparable to ours; and (3) based its order on the 'best interests of the child.' " *Qiuyue Shao* v. *Yue Ma*, 68 Mass. App. Ct. 308, 314 (2007), citing *Khan*, 446 Mass. at 95. This "analysis tracks standards reflecting the traditional doctrine of comity." *Khan*, *supra* at 94, citing *Schiereck* v. *Schiereck*, 14 Mass. App. Ct. 378, 380 (1982) ("Because the decree was issued by a foreign court, the doctrine of comity is invoked. See *Hilton* v. *Guyot*, 159 U.S. 113, 163-164 [1895]"). See *Custody of a Minor (No. 3)*, 392 Mass. 728, 735 (1984).[12] These and other traditional principles of international comity all find their source in the seminal decision of the United States Supreme Court, *Hilton* v. *Guyot*, *supra* at 163-167, 190-191, 202-203, 228.[13]

The issue before us, whether the substantive laws of the Jaa-

---

[12]In *Qiuyue Shao*, *supra* at 314-315, we considered citizenship and reciprocity as matters bearing on the question of deference to a foreign nation's custody order. See *Hilton* v. *Guyot*, 159 U.S. at 228; *Universal Adjustment Corp.* v. *Midland Bank, Ltd., of London*, 281 Mass. 303, 317 (1933); *Pacific Wool Growers* v. *Commissioner of Corps. & Taxn.*, 305 Mass. 197, 209 (1940). See also Restatement (Second) of Conflict of Laws § 98 (Approved Official Draft 1971), cited approvingly in *Custody of a Minor (No. 3)*, 392 Mass. at 735 (citing *Schiereck* v. *Schiereck*, *supra*), and *Khan*, 446 Mass. at 94, in the context of cases considering foreign custody laws. On these factors the scale tips in favor of the mother. The parties and their children are United States citizens, and at the time the father filed reconciliation and guardianship actions in the Jaafarite Court, the only residence of the parties as an intact married couple, and the only home the children ever had known, was in the Commonwealth. The record discloses no treaty or other agreement to which the United States is also a party that compels Lebanon's recognition of a foreign court's custody judgment.

[13]Although the record does not reflect the basis for the jurisdiction of the

farite Court in Lebanon are in substantial conformity with those of Massachusetts, turns largely on the question whether the Lebanese Jaafarite Court considers the best interests of the children, as that standard is understood under the laws of the Commonwealth.[14]

Here, the probate judge credited evidence, including certain testimony of the parties' experts, that, as between separating or divorcing parents, the Jaafarite Court in Lebanon will give the father custody of a son over the age of two absent circumstances, not present here, that would render him unfit. Compare *Tazziz,* 26 Mass. App. Ct. at 812-813, 816, citing *Custody of a Minor (No. 3),* 392 Mass. at 735-736 (where no expert testimony or evidence presented regarding governing principles of family law in Sharia Court in Israel, and "to what extent those principles . . . would be substantially consistent with the governing principles of Massachusetts law regarding child custody," case remanded for determination, among other things, whether law applicable in foreign court includes "basic concern for the best interests of the children, as contrasted, for example, with an undue consideration for purely parental interests").

As the judge's findings reflect, not only the mother's experts, but also those of the father support the rulings as to the law that governed the parties' custody proceedings in the Jaafarite Court in Lebanon. The father's expert "testified that custody in Lebanon is determined according to the 'best interest of the child' but that there is a presumption that it is in the best interest of male children [to] be in the custody of the mother until the age of two and after that, [that] they be in the custody of the father." A second expert testifying for the father stated, in response to a question regarding the mother's right to petition for custody in Lebanon, that "once a male child reaches the age of two, the father is more entitled to custody." The mother's expert testified that "in Lebanese Jaafarite Court, best interest for the child is being with the father after the age of two." The presumption

Jaafarite Court, we have assumed that it had jurisdiction to determine the custody of the children. See *Jones* v. *Jones,* 349 Mass. 259, 261 (1965), and cases cited.

[14]No issue has been raised regarding substantial conformity of the Jaafarite Court's laws governing notice and procedure.

may be rebutted only upon evidence of unfitness, such as that the father "is a criminal, taking drugs, or incapable of caring for the child."[15]

The father argues that the presumption could have been rebutted by the mother, had she sought custody in the Lebanese Jaafarite Court on the basis that the father was disabled. He claims this would have "triggered an investigation into the fitness of the parents" and a custody determination that would have applied a best interests standard. It was within the probate judge's discretion to credit some, but not all, of the testimony of the father's experts and to reject an expert's opinion, in whole or in part. See *Guardianship of Brandon*, 424 Mass. 482, 499 (1997); *Dewan* v. *Dewan*, 30 Mass. App. Ct. 133, 135 (1991). The evidence presented in this case amply supports the judge's finding that it is not the relative fitness of the parents that is considered by the Jaafarite Court in Lebanon, but only the father's fitness, and if both parents are fit, then the father will be awarded custody. On this basis, the judge's conclusion was correct that no deference was due the Jaafarite Court custody decree.

The best interests of a child is the overarching principle that governs custody disputes in the Commonwealth. See *Custody of Kali*, 439 Mass. 834, 840 (2003), and cases and authorities collected therein. "[T]he touchstone inquiry of what is 'best for the child' is firmly rooted in American history, dating back to the Nineteenth Century." *Ibid.* What is in a child's best interest depends upon the particular needs of the child, and is left largely to the discretion of the judge, who "may consider any factor pertinent to those interests." *Houston* v. *Houston*, 64 Mass. App. Ct. 529, 535 (2005). Thus, no case has set forth a definitive list of criteria that must be considered in determining what is in a child's best interest. However, some constants are revealed in our decisional law.[16] See, e.g., *Custody of Kali, supra* at 842 (it is in best interests of child to preserve "current placement

---

[15]Although the father argues that the mother could have made allegations regarding the father's unfitness, the factors cited by his experts, such as incapacity to care for the children due to incarceration or disability, were not present here. See note 2, *supra.* As the father's expert testified, even if the father had an illness but still was capable of caring for his children, the Jaafarite Court would "give him custody."

[16]In some circumstances, not relevant here, our statutes also set forth fac-

with a parent, if it is a satisfactory one"; "stability and continuity with the child's primary caregiver is itself an important factor in a child's successful upbringing"; it is a gender-neutral inquiry). Other factors that have been considered all focus on what is in the child's best interest. See, e.g., *Hersey* v. *Hersey*, 271 Mass. 545, 555 (1930) (parental fault does not override child's best interest; child happy and healthy in present home with half-brother and in care of her mother); *Allen* v. *Allen*, 326 Mass. 214, 217 (1950) (in deciding custody, judge could credit testimony "as to the home in which the girl seemed to be happier"); *Vilakazi* v. *Maxie*, 371 Mass. 406, 409 (1976) ("In providing for the custody of a minor child, while the feelings and the wishes of the parents should not be disregarded, the happiness and the welfare of the child should be the controlling consideration"), quoting from *Jenkins* v. *Jenkins*, 304 Mass. 248, 250 (1939); *Felton* v. *Felton*, 383 Mass. 232, 233 (1981) (discussing diverse religious practices of parents; overriding goal is to serve best interests of children even where "attainment of that purpose may involve some limitation of the liberties" of a parent); *Williams* v. *Massa*, 431 Mass. 619, 636 (2000) (consideration given to which parent "would more likely be able to make appropriate decisions to address the children's special needs"); *Haas* v. *Puchalski*, 9 Mass. App. Ct. 555, 557 (1980) (judge could consider that father's home not "a settled home" as child would be cared for by many different relatives); *Rolde* v. *Rolde*, 12 Mass. App. Ct. 398, 405 (1981) (that mother was "primary nurturing parent" and "primary caretaker," and that children have "strongest bond" with mother, were factors "highly significant for the welfare of the children"); *Bouchard*

tors that are to be considered in deciding who has the right to custody of a child. See, e.g., G. L. c. 208, § 31A, inserted by St. 1998, c. 179, § 3 (court to "consider evidence of past or present abuse toward a parent or child as a factor contrary to the best interest of the child" when issuing custody order); G. L. c. 209C, § 10, inserted by St. 1986, c. 310, § 16 (standards for awarding custody between unmarried parents; among listed factors, "court shall, to the extent possible, preserve the relationship between the child and the primary caretaker parent"); G. L. c. 210, § 3(*c*), as appearing in St. 1999, c. 3, § 17 (dispensing with parental consent to adoption if in best interests of child; "court shall consider the ability, capacity, fitness and readiness of the child's parents . . . and . . . the petitioners. . . . In making the determination, the health and safety of the child shall be of paramount, but not exclusive, concern").

v. *Bouchard*, 12 Mass. App. Ct. 899, 899-900 (1981) (findings should examine "relative advantages of the respective parental environments" and "in what respects that environment has been helpful or detrimental to the child's well being").

This is by no means an exhaustive list of all the factors that have been considered by our courts as relevant to a child's best interests, nor do we suggest which of these factors are appropriate to consider in any given case. We list them only to underscore our determination that, in the Commonwealth, as in most jurisdictions in the United States, the best interests analysis is a child-centered one that focuses on the specific needs and interests of a child and how these might best be met. The standard does not focus on "purely parental interests," *Tazziz*, 26 Mass. App. Ct. at 813, and significantly, it requires a gender-neutral analysis. See *Silvia* v. *Silvia*, 9 Mass. App. Ct. 339, 340-341 (1980) (Massachusetts comprehensive statutory scheme and common law regarding care and maintenance of minor children treats mother and father alike). See also *Custody of Kali*, 439 Mass. at 842; Kindregan & Inker, Family Law and Practice §§ 47.1 & 47.6 (3d ed. 2002).

The best interests analysis our courts employ is thus unlike the presumptive entitlement to custody that governed the custody proceeding in the Jaafarite Court in Lebanon. The custody judgment of that court is therefore not in substantial conformity with the laws of the Commonwealth.

2. *Custody agreement as bar.* Our conclusion that the Lebanese Jaafarite Court would not have considered the children's best interests, as that standard is understood in the Commonwealth, also resolves the father's claim that the parties' agreement as to custody that was entered into in Lebanon bars the mother from seeking custody in the Probate and Family Court. Cf. *Vorontsova* v. *Waronzov*, 75 Mass. App. Ct. 20, 25 n.11 (2009) (concluding there was no error in judge's refusal to recognize foreign nation's divorce certificate under doctrine of comity; noting support for proposition that court could consider whether circumstances warrant collateral attack on ground of fraud, even where it would not have been permitted in foreign nation).

The father claims on appeal that the probate judge erred in concluding that the mother was under duress when she entered

into the agreement. He argues that the mother was not under duress because she had other alternatives available to her in that she could have challenged the father's claim to custody and, at a hearing, the children's best interests would have been considered, which might have resulted in an award of custody to the mother. See note 15, *supra.* The father relies on *Khan* to support his claim that the custody agreement is a bar to seeking custody in the Probate and Family Court.[17]

In *Khan,* unlike the case before us, the law of Trinidad was determined to be in substantial conformity with our own in that "Trinidad judges are bound by statute and case law to treat the welfare of the minor child as the paramount consideration in determining custody issues." 446 Mass. at 97.[18] That case did not, on appeal, raise any question of duress.

Here, the probate judge credited the mother's testimony that the parties had agreed to return to Lebanon for the purposes of obtaining a religious divorce there, and had agreed that the mother would receive custody of the children.[19] The judge also found, "Although the Wife was represented in Lebanon and entered into an agreement regarding custody and visitation, I

[17]On appeal, the father also argues that the mother is estopped from collaterally attacking the Lebanese Jaafarite Court judgment. So far as appears from the trial court record, that claim was advanced only in the father's proposed conclusions of law and is there undeveloped by argument or citation to relevant authority. He relies in his brief on *Bassett* v. *Blanchard,* 406 Mass. 88, 90-91 (1989), and *Moran* v. *Gala,* 66 Mass. App. Ct. 135, 139-142 (2006), but nothing in those cases provides support for his claims.

[18]In *Khan, supra* at 91-92, a consent judgment addressing custody previously had entered in the Trinidad Family Court and the Probate and Family Court judge declined to exercise jurisdiction under section 14 of the MCCJA. The mother in *Khan* filed motions for reconsideration and a stay of the order requiring the son's return to Trinidad, claiming she had agreed to the Trinidad consent judgment under duress, but duress was not an issue that was specifically addressed on appeal. *Id.* at 92. The court rejected the mother's claim that the consent decree was reached without evaluation of the son's best interest, "because the terms of the decree to which she now objects were reached on the basis of her agreement." *Id.* at 97. We think the decision assumes that the consent decree had not been entered into under duress.

[19]The mother claimed below: "My husband refused to grant a divorce in Massachusetts, and enticed me into returning to Lebanon on the premise that a divorce from the religious courts in Lebanon could not be granted in Massachusetts, and that he would grant me custody of the children in Lebanon if I returned to Lebanon with him in order to get the divorce."

credit her testimony that she did so only because she knew under the substantive law of that court, she could not obtain custody and was merely attempting to secure visitation." Finally, the judge concluded that under governing law in the Lebanese Jaafarite Court, the mother would not have been awarded custody of the sons after the age of two had she sought custody in that court. See discussion, *supra.* These subsidiary and ultimate findings and rulings support a determination that the mother's agreement to give guardianship of the children to the father was obtained under duress and was thus unenforceable. See *Cabot Corp.* v. *AVX Corp.*, 448 Mass. 629, 637 (2007) ("It is well established that a contract entered into under duress is voidable"). To avoid enforcement of a contract, a contracting party may prevail on a theory of duress if she demonstrates "(1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party." *Id.* at 637-638, quoting from *International Underwater Contractors, Inc.* v. *New England Tel. & Tel. Co.*, 8 Mass. App. Ct. 340, 342 (1979). Cf. *Segal* v. *Segal*, 278 N.J. Super. 218, 222 (1994) (one-sided settlement agreement obtained in exchange for granting wife Jewish divorce was unenforceable as a product of duress); *Golding* v. *Golding*, 176 A.D.2d 20, 21-24 (N.Y. 1992) (wife compelled to enter into agreement by husband's invocation of his power to refuse to give her a Jewish divorce).

C. *Child support.* The father's assertion that the child support order is erroneous assumes (1) that the judgment that orders him to pay $1,840 per week is a scrivener's error, and that $184 is intended; and (2) that the judge's finding that the mother earns approximately $60,000 a year is not an error and requires a recalculation of the child support award.

It is apparent from the judge's findings that he intended to order $184 in weekly child support. The findings state that the father should pay child support to the mother "in the amount of $184.00 per week which is consistent with the child support guidelines." Thus, it is clear that the judgment contains a scrivener's error.

Regarding the mother's salary, the Child Support Guidelines worksheet that was before the probate judge is based on an an-

nual income of the mother in the amount of $45,290. Furthermore, even though the finding states that the mother "earns approximately $60,000 per year," the findings also refer to the mother's financial statement, which reflects that the mother's current annual income is $45,284.20 per year — an amount consistent with the mother's paycheck. The $60,000 figure thus seems to be an error, but a harmless one. Apart from these two minor errors, the findings are sufficient and the judgment is presumptively correct under the Child Support Guidelines.

So much of the judgment as orders the father to pay $1,840 in weekly child support payments is to be modified to order the father to pay $184 in weekly child support payments. As so modified, the judgment is affirmed.

*So ordered.*